# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

Nos. 12-1026, 12-1051 (consol.)

---

## UNITED STATES AND THE STATE OF ILLINOIS,

*Plaintiffs-Appellants*,

v.

## MIDWEST GENERATION, LLC, EDISON MISSION ENERGY, AND COMMONWEALTH EDISON CO.,

*Defendant-Appellees.*

---

On Appeal from the U.S. District Court for the Northern District of Illinois, No. 09-5277 (Hon. John W. Darrah).

---

## PETITION FOR EN BANC AND PANEL REHEARING BY THE UNITED STATES

*Of Counsel:*
CAROL S. HOLMES
SEEMA KAKADE
MELINA WILLIAMS
  U.S. Environmental
  Protection Agency
  1200 Pennsylvania Ave., NW
  Washington, DC 20640

ROBERT G. DREHER
 Acting Assistant Attorney General

AARON P. AVILA
JENNIFER A. LUKAS-JACKSON
KRISTIN M. FURRIE
ROBERT J. LUNDMAN
  U.S. Department of Justice
  Environment & Nat. Res. Div.
  P.O. Box 7415
  Washington, DC 20044
  (202) 514-2496

## TABLE OF CONTENTS

INTRODUCTION AND STATEMENT .......................................................................... 1

STATUTORY BACKGROUND .................................................................................. 2

FACTS AND PROCEDURAL HISTORY ...................................................................... 4

ARGUMENT .......................................................................................................... 7

CONCLUSION ..................................................................................................... 15

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ATTACHMENT: Panel Opinion

# TABLE OF AUTHORITIES

**CASES:**

*Alaska Dep't of Envtl. Conservation v. EPA,*
    540 U.S. 461 (2004) ........................................................................... 14

*Cabell v. Markham,*
    148 F.2d 737 (2d Cir. 1945) ............................................................. 15

*Citizens Against Ruining the Env't v. EPA,*
    535 F.3d 670, (7th Cir. 2008) ................................................. 2, 11, 14

*Dolan v. United States Postal Serv.,*
    546 U.S. 481 (2006) ......................................................................... 15

*KM Enters., Inc. v. Global Traffic Techs., Inc.,*
    __ F.3d __, 2013 WL 3958385 (7th Cir. Aug. 2, 2013) ................................ 13, 14

*Nat'l Parks Conservation Ass'n v. TVA,*
    480 F.3d 410 (6th Cir. 2007) .................................................. 2, 9, 10

*Nat'l Parks Conservation Ass'n v. TVA,*
    502 F.3d 1316 (11th Cir. 2007) ........................................................ 10

*Senne v. Village of Palatine,*
    695 F.3d 597 (7th Cir. 2012) ........................................................... 15

*Sierra Club v. Dairyland Power Coop.,*
    2010 WL 4294622 (W.D. Wis. 2010) ......................................... 10, 14

*Sierra Club v. Otter Tail,*
    615 F.3d 1008 (8th Cir. 2010) ......................................................... 10

*Sierra Club v. Portland Gen. Elec. Co.,*
    663 F. Supp. 2d 983 (D. Or. 2009) .................................................. 12

*United States v. Berkos,*
    543 F.3d 392 (7th Cir. 2008) ............................................................. 8

*United States v. Cinergy Corp.,*
    458 F.3d 705 (7th Cir. 2006) ............................................................. 4

*United States v. Costello,*
    666 F.3d 1040 (7th Cir. 2012) ......................................................... 15

*United States v. Duke Energy Corp.*,
    278 F. Supp. 2d 619 (M.D.N.C. 2003), *aff'd on other grounds*,
    411 F.3d 539 (4th Cir. 2005), *vacated on other grounds*,
    *Envtl. Def. v. Duke Energy Corp.* 549 U.S. 561 (2007). ............................ 12, 13

*United States v. EME Homer City Generation, L.P.*,
    __ F.3d __, 2013 WL 4437219 (3d Cir. Aug. 21, 2013) .............................. 10, 13

*United States v. Louisiana Generating, LLC*,
    __ F. Supp. 2d __, 2011 WL 6012997 (Dec. 1, 2011) ........................................ 12

*United States v. Marine Shale Processors*,
    81 F.3d 1329 (5th Cir. 1996) ....................................................... 2, 11, 12, 14

*United States v. Midwest Generation, LLC*,
    694 F. Supp. 2d 999 (N.D. Ill. 2010) ............................................................ 5, 6

*United States v. Midwest Generation, LLC*,
    781 F. Supp. 2d 677 (N.D. Ill. 2011) ................................................................. 6

*United States v. Ohio Edison*,
    2003 WL 23415140 (S.D. Ohio. Jan. 17, 2003) ............................................... 12

*Wis. Elec. Power Co. v. Reilly*,
    893 F.2d 901 (7th Cir. 1990) .............................................................................. 3

**STATUTES:**

28 U.S.C. § 2462 ...................................................................................................... 6

31 U.S.C. § 3701 .................................................................................................... 13

Clean Air Act:

    42 U.S.C. § 7401(b)(1) ...................................................................................... 2

    42 U.S.C. § 7409 ............................................................................................... 2

    42 U.S.C. § 7410 ............................................................................................... 2

    42 U.S.C. § 7411 ............................................................................................... 3

    42 U.S.C. § 7411(a)(4) ...................................................................................... 4

42 U.S.C. § 7412 ................................................................................ 3

42 U.S.C. § 7413(b) .......................................................................... 13

42 U.S.C. § 7470(1) ............................................................................ 3

42 U.S.C. § 7475 ................................................................ 1, 5, 7, 9

42 U.S.C. § 7475(a) ........................................ 1, 3, 4, 7, 10, 13, 14

42 U.S.C. § 7475(a)(1) ........................................................ 1, 5, 10, 11

42 U.S.C. § 7475(a)(4) ...................................................... 5, 7, 8, 10, 11

42 U.S.C. § 7479(2)(C) ...................................................................... 4

42 U.S.C. § 7479(3) .............................................................. 1, 3, 7

42 U.S.C. § 7602(k) .......................................................................... 4, 8

42 U.S.C. § 7661a(a) ........................................................................ 14

## RULES AND REGULATIONS:

Fed. R. App. P. 35(b)(1) ...................................................................... 1

Fed. R. App. P. 40(a)(2) .................................................................... 1, 2

Fed. R. Civ. P. 54(b) .......................................................................... 7

40 C.F.R. § 19.4 .............................................................................. 13

40 C.F.R. § 52.21(j)(1) ...................................................................... 8

40 C.F.R. § 52.21(j)(2) ...................................................................... 8

40 C.F.R. § 52.21(j)(3) .................................................................... 8, 10

40 C.F.R. § 52.738 ............................................................................ 9

40 C.F.R. § 70.1(b) .......................................................................... 14

45 Fed. Reg. 52,676 (Aug. 7, 1980) .................................................... 9

## INTRODUCTION AND STATEMENT

The United States seeks rehearing en banc or panel rehearing to correct the panel's flawed interpretation of the Clean Air Act's Prevention of Significant Deterioration program. Section 7475(a) of that program ensures that areas that meet clean air standards stay that way by, among other things, requiring newly constructed or modified facilities to meet the "best available control technology" "emission limitation." 42 U.S.C. §§ 7475(a), 7479(3). But the panel concluded that the best available control technology or "BACT" obligation functions only as a building code, governing construction. According to the panel, the BACT obligation does nothing to actually reduce pollution. The panel decided that "[i]f the owners ripped out or deactivated the best available control technology after finishing construction that would not violate §7475." Op. 6.

The panel decision is wrong because the Act defines BACT as an "emission limitation," which is then defined as a limitation that applies on a "continuous basis." *Infra* at 8. The BACT obligation thus governs the operation of a plant. The panel, however, completely ignored these statutory definitions, construing what BACT requires without even considering how Congress defined BACT in the Act. The panel then made the same error with respect to the permit required by Section 7475(a)(1), concluding that it is just a construction permit without acknowledging that the permit must "set[ ] forth emission limitations." 42 U.S.C. § 7475(a)(1).

Rehearing en banc is warranted because the meaning of Section 7475(a) is an issue of exceptional importance and the panel's decision is inconsistent with decisions of other Circuits and this Court. Fed. R. App. P. 35(b)(1); *see also* Fed. R.

App. P. 40(a)(2).  As to the meaning of the BACT obligation, the panel decision

conflicts with the Sixth Circuit's decision in *Nat'l Parks Conservation Ass'n v. TVA*,

480 F.3d 410, 419 (6th Cir. 2007), discussed *infra* at 9-10.  As to the meaning of the

permit obligation, the panel decision is inconsistent with this Court's decision in

*Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 673 n.3 (7th Cir. 2008),

and conflicts with the Fifth Circuit's decision in *United States v. Marine Shale

Processors*, 81 F.3d 1329, 1355-57 (5th Cir. 1996).  *Infra* at 10-11.  Finally, the

panel's error is exceptionally important because it allows old power plants and other

old sources of pollution (e.g., factories, refineries) to continue to pollute without

modern pollution controls, even when it is established (as it is for this appeal) that

the plants were modified in a way that triggered the BACT and permit obligations

under the Act.  The old plants that the panel exempts from regulation are some of

the largest sources of air pollution.  That pollution causes serious pulmonary

problems, some of which are fatal, as well as widespread environmental damage to

land, wildlife, and water.

## STATUTORY BACKGROUND

Congress enacted the Clean Air Act "to protect and enhance the quality of the

Nation's air resources so as to promote the public health and welfare and the

productive capacity of its population."  42 U.S.C. § 7401(b)(1).  The Act directs the

Environmental Protection Agency (EPA) to promulgate National Ambient Air

Quality Standards specifying allowable concentrations of air pollutants.  *Id.* § 7409.

States in turn must develop State Implementation Plans to achieve and maintain

the National Ambient Air Quality Standards.  *Id.* § 7410 .

The Prevention of Significant Deterioration program aims to prevent deterioration of air quality in areas where ambient air quality already meets the national standards. *Id*. § 7470(1), (3); *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 904 (7th Cir. 1990). The core of this program imposes specified requirements when a new major emitting facility is constructed or an existing major emitting facility is modified. These include two requirements that apply to operations and that are at issue here – to have a permit and to apply BACT. Specifically, 42 U.S.C. § 7475(a) provides:

> No major emitting facility * * * may be constructed [in a covered geographic area] unless—
>
>> (1) a permit has been issued for such proposed facility in accordance with this part setting forth emission limitations for such facility which conform to the requirements of this part; * * *
>>
>> (4) the proposed facility is subject to the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility;

The Act defines "best available control technology"[1] as an "emission limitation." *Id.* § 7479(3). Then the Act defines an "emission limitation" as something restricting

---

[1] The full definition from Section 7479(3) follows: "The term 'best available control technology' means an emission limitation based on the maximum degree of reduction of each pollutant subject to regulation under this chapter emitted from or which results from any major emitting facility, which the permitting authority, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such facility through application of production processes and available methods, systems, and techniques, including fuel cleaning, clean fuels, or treatment or innovative fuel combustion techniques for control of each such pollutant. In no event shall application of 'best available control technology' result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to section 7411 or 7412 of this title. Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above

"emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction." *Id.* § 7602(k). Thus, the "best available control technology" requirement is not just an equipment requirement; it is an emission limitation that governs the operation of the plant.

Many "major emitting facilities" were built before Congress created the Prevention of Significant Deterioration program. Those facilities were not immediately required to control their emissions or obtain a permit. Instead, they were grandfathered, but not forever. If their owners "modified" them in a way that increased pollution, then the Act required that the old facilities comply with the Prevention of Significant Deterioration requirements, including the BACT emission-limitation and permit requirements. *Id.* §§ 7411(a)(4), 7479(2)(C); *see also, e.g., United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006).

## FACTS AND PROCEDURAL HISTORY

Because the district court dismissed the government's complaint, the following facts pleaded in the complaint are established for the purpose of this appeal. *See* Dkt. 93 (amended complaint). The case concerns six coal-fired power plants in and around Chicago, Illinois. Between 1994 and 1999, ComEd modified each of them in ways that increased pollution and thus triggered the Clean Air Act's Prevention of Significant Deterioration requirements. ComEd did not, however, obtain the required permits for the modified plants or do anything to meet BACT

---

levels that would have been required under this paragraph as it existed prior to November 15, 1990."

emission limitations.  The six plants therefore continued to discharge large and
unauthorized amounts of nitrogen oxides, sulfur dioxide, and particulate matter.
That pollution has significant negative public health impacts.

In 1999, ComEd sold the plants to Edison Mission Energy, which
immediately transferred ownership to Midwest Gen, its wholly-owned subsidiary.
Midwest Gen soon modified one of the six plants (the Will County plant) in a way
that triggered Prevention of Significant Deterioration requirements, without
obtaining a Section 7475(a)(1) permit or complying with the Section 7475(a)(4)
BACT emission-limitation obligation.  Op. 3; Dkt. 93 ¶¶ 2, 74-88, 462-501.

The United States and Illinois filed suit against Midwest Gen in 2009.
Dkt. 1.  We alleged that Midwest Gen was violating the Clean Air Act by operating
all six plants without Prevention of Significant Deterioration permits and without
complying with the BACT emission-limitation obligation.  We separately alleged
that Midwest Gen had violated Title V of the Clean Air Act and provisions of
Illinois' State Implementation Plan that govern visible emissions, called "opacity."

On March 9, 2010, the district court issued an opinion dismissing nine of our
ten Prevention of Significant Deterioration claims, all but the one relating to
Midwest Gen's modification of the Will County plant.  *United States v. Midwest
Generation, LLC*, 694 F. Supp. 2d 999 (N.D. Ill. 2010).  The court concluded that 42
U.S.C. § 7475 prohibits the construction or modification of a facility without a
permit but does not prohibit operation of a modified facility without complying with

the BACT or permit obligations.  *Id.* at 1004.  Thus, according to the district court, Midwest Gen did not violate the statute when it operated the modified plants.

We then amended our complaint to include ComEd as a defendant and asked the district court to enter an injunction requiring ComEd to correct its violations. Dkt. 93.  We also alleged that Midwest Gen and Edison Mission Energy had expressly assumed ComEd's liability as its successors under the terms of the Asset Sale Agreement.  That Agreement provided that Edison Mission Energy assumed liability for environmental claims that arose during ComEd's ownership.  Finally, we clarified that Midwest Gen had itself violated an Illinois State Implementation Plan provision that imposes liability on "persons" who "operate" sources modified in violation of Prevention of Significant Deterioration requirements.  *See* 415 ILCS 5/9.1(d)(2).

The district court dismissed the new claims.  *United States v. Midwest Generation, LLC*, 781 F. Supp. 2d 677 (N.D. Ill. 2011).  The court held that we could not state a claim for injunctive relief against ComEd because ComEd no longer owned the six power plants and ordering ComEd to purchase and retire emission allowances would amount to "penalty" that was time-barred by 28 U.S.C. § 2462, which provides a five-year statute of limitations for enforcement actions for a "civil fine, penalty, or forfeiture."  *Id.* at 684-86.  The court rejected our claims that Midwest Gen and Edison Mission Energy were liable as ComEd's successors-in-interest and our claims under the Illinois State Implementation Plan.  *Id.* at 682-84, 686-90.  The court entered a Rule 54(b) judgment as to the dismissed claims.

We appealed, and a panel of this Court affirmed.  The panel concluded that 42 U.S.C. § 7475(a) "specifies what must be built, not how the source operates after construction," and thus the operation of the plants without BACT emission limitations or a permit was not a violation.  Op. 6.  According to the panel, "[i]f the owners ripped out or deactivated the best available control technology after finishing construction that would not violate §7475—though it might well violate some other statute, regulation, or implementation plan prescribing how polluters run their facilities."  Op. 6.

## ARGUMENT

When a plant is modified, Section 7475(a) imposes the two ongoing and operational obligations at issue here: the BACT emission-limitation obligation and the permit obligation.  The panel misread the statute, and its decision cannot be squared with a decision from the Sixth Circuit as to the meaning of the BACT obligation and with decisions of this Court and the Fifth Circuit as to the meaning of the permit obligation.

We start with the language of the statute.  In Section 7475(a)(4), "the proposed facility is subject to the best available control technology [BACT] for each [regulated] pollutant * * * emitted from" the facility.  42 U.S.C. § 7475(a)(4).  The panel noted that language and the introductory language of (a) providing that no facility "may be constructed * * * unless" the requirements that follow are met.  Op. 5.  But the panel downplayed the language establishing that a modified facility is "subject to" BACT and then ignored the statutory definition of BACT.  The Act defines BACT as an "emission limitation," 42 U.S.C. § 7479(3), and then defines an

"emission limitation" as something restricting "emissions of air pollutants *on a continuous basis*, including any requirement relating to *the operation* or maintenance of a source to assure *continuous* emission reduction," 42 U.S.C. § 7602(k) (emphasis added).  Both of these definitions are absent from the panel's opinion.

Because a modified facility is "subject to" the BACT "emission limitation" that applies on a "continuous basis," Section 7475(a)(4) does not impose just a construction obligation.  The "may be constructed" language simply makes clear that a violation of the BACT obligation *begins* at construction – when the facility is first "subject to" the obligation – it does not mean that the violation ends at that moment.  During construction the plant is not operating and thus is not emitting pollutants.  If the BACT requirement applied only at the time of construction, then it would be neither "continuous" nor an "emission limitation," rendering the statutory definition meaningless.  *See, e.g., United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008) ("We avoid interpreting a statute in a way that renders a word or phrase redundant or meaningless.").  The violations continue to occur when the plant is operated without the required emission limitations.

The panel also failed to address EPA's regulations imposing ongoing BACT requirements.  These regulations make clear that the BACT emission limitation requirement imposes an ongoing and operational obligation by instructing that a modified facility "shall apply" BACT.  40 C.F.R. § 52.21(j)(3); *see also id.* § 52.21(j)(2) (same for new sources); *id.* § 52.21(j)(1) (requiring that any modification "shall

8

meet" each applicable "emissions limitation" and New Source Performance Standard); *id.* § 52.738 (incorporating these requirements into Illinois State Implementation Plan).  When EPA promulgated this regulation in 1980, it explained that "Section 165 of the Act [42 U.S.C. § 7475] provides in part that any 'major emitting facility' constructed in a [Prevention of Significant Deterioration] area must apply best available control technology."  45 Fed. Reg. 52,676, 52,722 (Aug. 7, 1980); *see also id.* at 52,725 ("Any source which improperly avoids review and commences construction will be considered in violation of the applicable [State Implementation Plan] and will be retroactively reviewed under the applicable [New Source Review] regulation.").  The panel's conclusion that BACT is only a construction obligation – that the new pollution control equipment need never be turned on, Op. 6 – is inconsistent with the regulatory requirement that a modified facility "shall *apply*" BACT.  And that "shall apply" requirement is fully consistent with the statutory language establishing that BACT is an emission limitation that applies on a continuous basis, not just a construction obligation.

The result reached by the panel here conflicts with the Sixth Circuit's conclusion that identical "shall apply" BACT language "creates an ongoing obligation to apply BACT."  *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410, 418-19 (6th Cir. 2007).  The Sixth Circuit explained that the failure to operate a plant consistent with the BACT obligation gives rise to a "failing to apply BACT" violation that "manifests itself anew each day a plant operates."  *Id.* at 419.  The panel here tries to distinguish the Sixth Circuit's decision on the basis that it rested

on particular "Tennessee statutes and implementation plans that require certain sources to *use* the best available control technology."  Op. 6 (emphasis in original). But this is wrong.  The Sixth Circuit relied on the Tennessee State Implementation Plan that contains the exact same "shall apply" language requiring BACT that is in the federal regulations that apply to Midwest Gen:

> Tennessee plan language relied on by the Sixth Circuit: "*A major modification shall apply best available control technology* for any pollutant for which it would result in a significant net emissions increase at the source."  480 F.3d at 418 (emphasis added).

> 40 C.F.R. § 52.21(j)(3):  "*A major modification shall apply best available control technology* for each regulated NSR pollutant for which it would result in a significant net emissions increase at the source." (emphasis added)

The panel's decision thus conflicts with the Sixth Circuit's decision in *National Parks Conservation Association*.

To be sure, the Third, Eighth, and Eleventh Circuits have reached results similar to the panel here.  *United States v. EME Homer City Generation, L.P.*, __ F.3d __, 2013 WL 4437219 (3d Cir. Aug. 21, 2013); *Sierra Club v. Otter Tail*, 615 F.3d 1008 (8th Cir. 2010); *Nat'l Parks Conservation Ass'n v. TVA*, 502 F.3d 1316 (11th Cir. 2007).  These cases, however, all suffer from the same error: they fail to realize that the BACT obligation is distinct from the permit obligation.  The BACT emission-limitation obligation in (a)(4) is placed on the "facility," and it applies regardless of whether the facility has the permit required by (a)(1).  *See, e.g., Sierra Club v. Dairyland Power Coop.*, 2010 WL 4294622 at *5 (W.D. Wis. 2010) ("the individual requirements in 42 U.S.C. § 7475(a) are not subsumed by the initial

requirement to obtain a preconstruction permit") (internal quotations and citations omitted).

The panel here not only misread the BACT requirement in Section 7475(a)(4), but made an additional error in interpreting the permit requirement established by Section 7475(a)(1). A Prevention of Significant Deterioration permit is not a mere "construction permit" that requires a company to "install the best available control technology" without governing "how the source operates after construction." Op. 5-6. Rather, Section 7475(a)(1) requires that a permit "set[ ] forth emission limitations." Because the permit must set forth emission limitations – and emission limits are only relevant while the facility is operating and thus generating emissions – it necessarily governs operations, not merely construction. The panel's description of the permit requirement is therefore inconsistent with this Court's decision in *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670 (7th Cir. 2008), which explained that Prevention of Significant Deterioration permits govern post-modification emissions: the permits "must impose" BACT rates "prescribing emission limitations." *Id.* at 673 n.3. This Court thus has previously recognized that Section 7475(a)(1) permits control operations, not just construction.

The panel's decision on the meaning of the permit requirement also conflicts with the Fifth Circuit's decision in *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996). There, the court explained that the failure to obtain a permit prior to construction of a modification gives rise to ongoing liability. *Marine Shale*, 81 F.3d at 1355-57 (recognizing that while permits are issued prior to

11

construction they also impose "limits upon a source's operations"). While the permit at issue in *Marine Shale* was for a minor source (the sources at issue here are major sources), the question of whether a permit that is required before construction begins can impose ongoing obligations is the same for minor sources and major sources. *See also United States v. Louisiana Generating, LLC*, __ F. Supp. 2d __, 2011 WL 6012997, at *10-11 (Dec. 1, 2011) (holding that *Marine Shale* is controlling on question of whether failure-to-secure permit violation for a major source is ongoing).[2]

The panel attempts to minimize the impact of its decision by pointing to the possibility of penalties against plant owners who modify their plants without complying with the Prevention of Significant Deterioration permit and BACT emission-limitation obligations. In describing ComEd's decision not to obtain a permit or to install BACT, the panel states that "[t]his was a risky strategy" because if someone had challenged ComEd's decision within the limitations period, then ComEd "could have needed to undertake a further round of modifications to get the permit and might have had to pay *hefty* penalties for the delay." Op. 2-3

---

[2] Several district court decisions also agree that a Prevention of Significant Deterioration permit governs operation. *See, e.g., Sierra Club v. Portland Gen. Elec. Co.*, 663 F. Supp. 2d 983, 993 (D. Or. 2009) ("Failure to obtain a permit in the first instance does not relieve an operator of the Act's ongoing operational requirements."); *United States v. Duke Energy Corp.*, 278 F. Supp. 2d 619, 650-51 (M.D.N.C. 2003) (discussing statutory definition of BACT and holding that "implementation of BACT is a condition of operation"), *aff'd on other grounds*, 411 F.3d 539 (4th Cir. 2005), *vacated on other grounds*, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007); *United States v. Ohio Edison*, 2003 WL 23415140, at *5 (S.D. Ohio. Jan. 17, 2003) ("the statute itself provides for the requirement of a preconstruction permit as well as ongoing operation in compliance with CAA standards for sources 'for which a permit is required'").

(emphasis added).  Elsewhere, however, the panel says that "[t]he violation is complete when construction commences without a permit in hand."  Op. 5.  If that latter statement is true, it is difficult to see how ComEd was at risk for "hefty penalties."  The Act currently authorizes penalties of up to $37,500 per day.  42 U.S.C. § 7413(b); 31 U.S.C. § 3701; 40 C.F.R. § 19.4.  Under the panel's reasoning, an owner like ComEd seemingly is at risk only for $37,500 per modification, far from a "hefty" sum.  *But cf. EME Homer City*, 2013 WL 4437219, at *9 (indicating that an owner may be liable for per day penalties for entire construction period).  And the risk of the penalty is especially paltry when compared to the savings a plant owner reaps by deferring and potentially avoiding the cost of expensive pollution control equipment.  *See Duke Energy*, 278 F. Supp. 2d at 652 (one-day penalty for Prevention of Significant Deterioration violation could make it "cost-effective to avoid the permit obligations altogether"; companies will "litigate the claim endlessly with little incentive to settle").

Finally, the panel's decision very oddly turns the Clean Air Act's Prevention of Significant Deterioration program – a program Congress created to curb air pollution – into a program requiring construction permits and the construction but not operation of pollution control equipment.  According to the panel, Section 7475(a) requires only a permit governing construction of the modification, plus the construction of pollution control equipment that then never needs to be turned on once construction is over.  Op. 6.  Statutes should not be construed in a way that "leads to some very odd results."  *KM Enters., Inc. v. Global Traffic Techs., Inc.*, __

F.3d __, 2013 WL 3958385, at *9 (7th Cir. Aug. 2, 2013). The panel's conclusion that Section 7475(a) mandates the construction of pollution control equipment that the owner never needs to use (Op. 6) is "very odd."[3] While it is possible that Congress did not fully think through what would happen if an owner modified a grandfathered plant without bothering to apply for a permit or controlling pollution, that potential oversight counsels for an interpretation of the statute that gives weight to Congress's purpose. Here, Congress intended that grandfathered plants come into compliance with the Prevention of Significant Deterioration requirements when the plants are modified. Instead of reading the language of Section 7475(a) without considering either the statutory definitions or the statutory purpose, the

---

[3] The panel speculates that "some other statute, regulation, or implementation plan" might fill the gap that their interpretation creates. Op. 6. The panel does not identify what that something else might be or how it could come close to requiring BACT emission limitations. *See, e.g., Alaska Dep't of Envtl. Conservation v. EPA,* 540 U.S. 461, 496-501 (2004) (upholding EPA conclusion that BACT requires most stringent yet feasible pollution control). If the panel thinks that Title V of the Clean Air Act fills this gap (we are speculating), that is incorrect given that the panel has construed the BACT emission-limitation obligation and permit obligation as imposing only construction requirements. Congress did not enact Title V until thirteen years after creating the Prevention of Significant Deterioration permitting program. Nothing indicates that Prevention of Significant Deterioration permits were generally unenforceable before Title V. *Dairyland,* 2010 WL 4294622, at *13 ("Before Title V was enacted in 1990, the [Prevention of Significant Deterioration] program had been imposing operational requirements on new sources and major modifications for thirteen years, and these operational requirements were specified in [Prevention of Significant Deterioration] permits."). In fact, Congress explained that "nothing [in the new Title V program] shall be construed to alter" existing Prevention of Significant Deterioration permitting requirements. 42 U.S.C. § 7661a(a); *see also Marine Shale,* 81 F.3d at 1355-56 (noting "confusion" that results from co-existence of Prevention of Significant Deterioration "preconstruction" and Title V "operating" permits); 40 C.F.R. §70.1(b). As this Court has held, Title V "complement[s]" rather than limits "EPA's enforcement authority." *Citizens Against Ruining the Env't,* 535 F.3d at 679.

panel should have weighed "the whole statutory text, considering the purpose and context of the statute." *Senne v. Village of Palatine*, 695 F.3d 597, 601 (7th Cir. 2012) (quoting *Dolan v. United States Postal Serv.*, 546 U.S. 481, 486 (2006)). "[S]tatutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning." *United States v. Costello*, 666 F.3d 1040, 1043 (7th Cir. 2012) (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (L. Hand, J.)). When the BACT and permit obligations are read in conjunction with the purpose of the Clean Air Act's Prevention of Significant Deterioration program, the panel's error in construing these obligations as governing only the construction of a modification becomes clear. The Clean Air Act is a pollution control statute not a building code, after all.

## CONCLUSION

For the foregoing reasons, the petition should be granted.

Respectfully submitted,

ROBERT G. DREHER
Acting Assistant Attorney General

*Of Counsel:*
CAROL S. HOLMES
SEEMA KAKADE          s/ Robert J. Lundman
MELINA WILLIAMS          AARON P. AVILA
   U.S. Environmental          JENNIFER A. LUKAS-JACKSON
   Protection Agency          KRISTIN M. FURRIE
   1200 Pennsylvania Ave., NW          ROBERT J. LUNDMAN
   Washington, DC 20640             U.S. Department of Justice
               Environment & Nat. Res. Div.
               P.O. Box 7415
September 3, 2013             Washington, DC 20044
90-5-2-1-09334             (202) 514-2496

**CERTIFICATE OF COMPLIANCE WITH TYPE VOLUME LIMITATION**

This brief complies with the page limit of Fed. R. App. P. 35(b)(2) and 40(b)

because it is 15 pages long.  The brief complies with the typeface requirements of

Fed. R. App. P. 32(a)(5) and Circuit Rule 32(b) and the type style requirements of

Fed. R. App. P. 32(a)(6) because I prepared it using Microsoft Office Word 2007 and

12-point Century Schoolbook type.


 s/ Robert J. Lundman
ROBERT J. LUNDMAN
Environment and Natural Resources Div.
U.S. Department of Justice
P.O. Box 7415
Washington, D.C. 20044
(202) 514-2496
robert.lundman@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on September 3, 2013, I served a copy of the foregoing petition

for en banc and panel rehearing upon the following counsel of record using the

Seventh Circuit's electronic case filing system:

Brian J. Murray                          Paul M. Smith
Jones Day                                Jenner & Block LLP
Suite 3500                               Suite 900
77 W. Wacker Drive                       1099 New York Avenue N.W.
Chicago, IL 60601-1692                   Washington, DC 20001-4412


Evan Siegel
Assistant Attorney General
Civil Appeals Division
Office of the Illinois Attorney General
100 West Randolph Street, 12th Floor
Chicago, Illinois 60601


      s/ Robert J. Lundman
     ROBERT J. LUNDMAN
     Environment and Natural Resources Div.
     U.S. Department of Justice
     P.O. Box 7415
     Washington, D.C. 20044
     (202) 514-2496
     robert.lundman@usdoj.gov

**ATTACHMENT: Panel Opinion**

In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 12-1026 & 12-1051

UNITED STATES OF AMERICA and
STATE OF ILLINOIS,

*Plaintiffs-Appellants,*

*v.*

MIDWEST GENERATION, LLC,
EDISON MISSION ENERGY, and
COMMONWEALTH EDISON COMPANY,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 5277—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 20, 2012—DECIDED JULY 8, 2013

Before EASTERBROOK, *Chief Judge*, and MANION and
TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   Any "major emitting facil-
ity" built or substantially modified after August 7, 1977,
in parts of the country subject to the rules about preven-
tion of significant deterioration (PSD), needs a permit.

42 U.S.C. §7475(a). This construction permit is in addition to the operating permits that many facilities require under the Clean Air Act and the need to comply with state implementation plans. One condition of a construction permit is installation of "the best available control technology for each pollutant subject to regulation under" the Act. 42 U.S.C. §7475(a).

Between 1994 and 1999 Commonwealth Edison Co. modified five of its coal-fired power plants: Crawford and Fisk in Chicago; Powerton in Pekin; Waukegan Station in Waukegan; and Joliet in Joliet. All five plants had been operating on August 7, 1977, and were grandfathered until the modification. We must assume, given the posture of this litigation, that the modifications required permits under §7475(a). But Commonwealth Edison did not obtain permits. The question "how much repair or change requires a permit?" has been contentious and difficult. See, e.g., *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007); *United States v. Cinergy Corp.*, 458 F.3d 705 (7th Cir. 2006); *United States v. Cinergy Corp.*, 623 F.3d 455 (7th Cir. 2010). Commonwealth Edison took the position that permits were not required and that it therefore was not obliged to install "the best available control technology" (called BACT in the jargon of environmental law).

This was a risky strategy because, if someone had contested the decision within the statute of limitations (five years; see 28 U.S.C. §2462), then Commonwealth Edison could have needed to undertake a further round of modifications to get the permit and might have had

to pay hefty penalties for the delay. As it happened, however, no one sued until 2009, a decade after the last of the modifications had been completed. The district court dismissed as untimely the claim based on §7475(a). 694 F. Supp. 2d 999 (N.D. Ill. 2010), reconsideration denied, 781 F. Supp. 2d 677 (2011). Claims concerning another plant remain pending, as do claims related to a different permit requirement for these five plants and the emissions limits for their continued operation. But the district court entered a partial final judgment under Fed. R. Civ. P. 54(b) so that the claim under §7475(a) could proceed to appeal while the parties' remaining disputes were ongoing in the district court.

After finishing the modifications, Commonwealth Edison sold the five plants to Midwest Generation. This has introduced some complications. The United States and Illinois, the two plaintiffs in this suit, contend that Midwest is liable as Commonwealth Edison's successor, and it accuses the district court of allowing a corporate restructuring to wipe out liability for ongoing pollution. Adding another twist, Midwest and its corporate parent Edison Mission Energy filed petitions under the Bankruptcy Code after the appeal was argued. The parties have agreed that the law-enforcement exception to the automatic stay in bankruptcy, 11 U.S.C. §362(b)(4), applies to these proceedings, which therefore need not be consigned to limbo. Nor need we worry about whether the sale had any effect on liability, and if so who would be responsible today. Midwest cannot be liable when its predecessor in interest would not have been liable had it owned the plants continuously.

Commonwealth Edison needed permits before under-
taking the modifications. By the time this suit com-
menced, between 10 and 15 years had passed since the
modifications were finished, at least double the five-year
period of limitations. Plaintiffs do not contend that the
time was extended by delay in discovering the modifica-
tions and, after *Gabelli v. SEC*, 133 S. Ct. 1216 (2013), no
such argument would be tenable. (*Gabelli* holds that
the time for the United States to sue under §2462 begins
with the violation, not with a public agency's discovery
of the violation.) *Gabelli* observes that "a claim accrues
when the plaintiff has a complete and present cause of
action" (133 S. Ct. at 1220, quoting from *Wallace v. Kato*,
549 U.S. 384, 388 (2007)) and that the statute of limita-
tions begins to run when the claim accrues. That
occurred as early as 1994 for one plant and no later
than 1999 for any of the five.

Plaintiffs concede all of this but reply that failure to
obtain a construction permit is a continuing violation. The
phrase "continuing violation" is ambiguous. It may
mean any of at least three things: (1) ongoing discrete
violations; (2) acts that add up to one violation only
when repeated; and (3) lingering injury from a com-
pleted violation. Analysis will be easier if we call the
first situation a continuing violation, the second a cum-
ulative violation, and the third a continuing-injury situa-
tion. See *Turley v. Rednour*, No. 11-1491 (7th Cir. July 3,
2013) (concurring opinion). Plaintiffs make arguments
of both the continuing-violation and continuing-injury
stripes.

The continuing-violation argument is that every day a plant operates without a §7475 permit is a fresh violation of the Clean Air Act. Congress sometimes writes regulatory statutes that way, but §7475 is not among them. Section 7475 bears the caption "Preconstruction requirements" and begins this way: "No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies unless—". The rest of §7475(a) spells out the conditions that must be met before the permit will issue. See also 40 C.F.R. §52.21(r)(1). The text bears out the caption: it specifies a step the operator must take before constructing or modifying a "major emitting facility". The violation is complete when construction commences without a permit in hand. Nothing in the text of §7475 even hints at the possibility that a fresh violation occurs every day until the end of the universe if an owner that lacks a construction permit operates a completed facility. *Gabelli* tells us not to read statutes in a way that would abolish effective time constraints on litigation.

Two other courts of appeals have considered whether operating a new or modified plant, despite failure to obtain a construction permit, is a new violation of §7475(a). Both have held that it is not. *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008 (8th Cir. 2010); *National Parks and Conservation Association Inc. v. Tennessee Valley Authority*, 502 F.3d 1316 (11th Cir. 2007). We agree with those decisions. Although plaintiffs insist that the construction permit has "an operational component," they

mean only that under §7475(a)(4) the operator must
install the best available control technology. Section
7475(a)(4) specifies what must be built, not how the
source operates after construction. If the owners ripped
out or deactivated the best available control technology
after finishing construction that would not violate
§7475—though it might well violate some other statute,
regulation, or implementation plan prescribing how
polluters run their facilities.

Plaintiffs stress that §7475(a)(4) says that newly built
or modified sources are "subject to" the need for the
best available control technology. That obligation,
they insist, continues after the construction work is done,
which leads them to say that *National Parks and Conserva-
tion Association Inc. v. Tennessee Valley Authority*, 480 F.3d
410 (6th Cir. 2007), disagrees with the eighth and
eleventh circuits. Yet the sixth circuit's decision rests on
Tennessee statutes and implementation plans that
require certain sources to *use* the best available control
technology, while §7475 deals only with conditions prec-
edent to construction or modification. Perhaps an Illinois
statute, regulation, or implementation plan provides
that any plant "subject to" BACT by virtue of §7475(a)(4)
must use it in operation, but any claim of that sort
remains pending in the district court. What BACT entails
is plant-specific. 40 C.F.R. §52.21(b)(12). All we have
for decision is a claim directly under §7475.

Plaintiffs maintain that 415 ILCS 5/9.1(d)(2) works the
same way as the Tennessee requirements that the sixth
circuit considered. To the extent that this contention is

independent of §7475, we leave it to the district judge in the first instance. To the extent that plaintiffs maintain that Commonwealth Edison has violated §5/9.1(d)(2) because it earlier violated §7475, the argument is wrong. Section 5/9.1(d)(2) provides that no one shall "modify or operate" a point source "except in compliance with the requirements of such Sections [of the Clean Air Act] and federal regulations adopted pursuant thereto". Plaintiffs point to "or operate", which is missing from §7475(a). This gets us nowhere, however; no one can operate a plant except in compliance with federal law with or without §5/9.1(d)(2). We have already concluded that §7475 deals with getting permission for construction, not with a plant's operations; it follows that Commonwealth Edison's violations of §7475 during the 1990s do not make its current operations a violation of federal law, so they do not derivatively violate §5/9.1(d)(2).

Plaintiffs' contention that a continuing injury from failure to get a preconstruction permit (really, from failure to use BACT) makes this suit timely is unavailing. What these plants emit today is subject to ongoing regulation under rules other than §7475. Today's emissions cannot be called unlawful just because of acts that occurred more than five years before the suit began. Once the statute of limitations expired, Commonwealth Edison was entitled to proceed as if it possessed all required construction permits. That's the point of decisions such as *United Air Lines, Inc. v. McMann*, 434 U.S. 192 (1977), and *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), which hold that enduring consequences of acts

8                              Nos. 12-1026 & 12-1051

that precede the statute of limitations are not independ-
ently wrongful.

A<small>FFIRMED</small>